IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PUBLIC CITIZEN HEALTH, RESEARCH GROUP, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 18-cv-1729-TJK |
| v. | ) ) ) | |
| ALEXANDER ACOSTA, Secretary, United States Department of Labor, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

**Declaration of Robert Harrison**

I, Robert Harrison, MD, MPH, declare as follows:

1. I am an occupational medicine physician and epidemiologist with more than 30 years of experience investigating and preventing work-related injuries and diseases. I am Clinical Professor of Medicine at the University of California at San Francisco, where I founded the UCSF Occupational Health Services and have examined and treated over 15,000 patients with occupational and environmental injuries and diseases. I have authored or co-authored more than 35 medical and scientific articles in peer-reviewed journals, more than 30 other publications, including book chapters, contributed articles, and letters to journal editors, and more than 25 governmental and other reports. I am Visiting Professor in the School of Public Health at the University of California at Berkeley, and serve as Chief of the Occupational Health Surveillance and Evaluation Program of the California Department of Public Health. I have served on the Executive Board of the Society for Occupational and Environmental Health, on the Governing Council and as Occupational Health Section Chair of the American Public Health Association, and as President of the Council of State and Territorial Epidemiologists (CSTE). From 2003-2006, I

was appointed by the Governor of California to serve as the Occupational Health Representative on the California Occupational Safety and Health Standards Board. I have served on the NIOSH Board of Scientific Counselors and on the World Trade Center Scientific and Technical Advisory Committee. In 2011, I was elected to the Collegium Ramazzini, an international organization of occupational and environmental health scientists. In 2016, I was honored by CSTE with the Pump Handle Award for outstanding achievement in the field of applied epidemiology.

2. In my capacity as a public health epidemiologist with CSTE, I have worked in collaboration, and consulted with, other State and Federal scientists to track and investigate work-related injuries and diseases. In so doing, I rely upon numerous sources of data about work-related injuries and diseases, including reports from employers, employees and health care providers that provide essential information about the types and causes of these health problems. I have published the results of these studies, along with my colleagues from State and Federal agencies, in peer-reviewed scientific journals. These investigations and publications have led to the prevention of work-related injuries and diseases, substantially reducing the disability and cost to employers, employees and their families.

3. Based on my qualifications, experience and training, I submit this declaration on behalf of CSTE.

4. CSTE is an organization of member states and territories representing public health epidemiologists. CSTE provides technical advice and assistance to partner organizations and to the Federal Centers for Disease Control and Prevention (CDC). CSTE members work closely with the CDC to track well recognized and new causes of work-related injuries. Since 1951, CSTE has the responsibility for defining and recommending which diseases and conditions are reportable within states and which of these diseases and conditions will be reported to the CDC. The list of

these conditions includes work-related diseases such as lead poisoning, silicosis and acute pesticide illness. These conditions are compiled and published weekly by the CDC, and are the basis for setting the public health priorities for our nation. These reports rely upon multiple sources of data, including reports by employers to state public health and regulatory agencies.

5. CSTE and their members rely on the type of reports that are required under the Rule at issue in order to effectively track, investigate and prevent work-related injury and disease in the United States. The CSTE Occupational Health Subcommittee, composed of senior occupational epidemiologists from many States, has worked with the CDC/NIOSH to define reportable occupational conditions in the US and to set guidelines for tracking of work-related injuries and diseases. These guidelines set forth the types of reports that are necessary for each state to receive to conduct effective public health programs to reduce the burden of work-related injuries and diseases, including reports from employers. In numerous instances, CSTE epidemiologists have relied upon reports from employers to identify serious and immediate injuries and diseases in the workplace. These include sudden death from methylene chloride in paint strippers used by trades workers, and the inhalation of solvent vapors during gauging of tanks by oil and gas workers; serious and disabling injuries from repetitive work in poultry and meatpacking plants; and back injuries in nurses due to patient lifting and transferring. In these cases, CSTE epidemiologists have used both state and national data to track the incidence of these work-related injuries and diseases, have performed public health investigations to understand the underlying risk factors that exist in the workplace, and have used this information to implement public health recommendations and inform regulatory action that has led to the prevention of these serious and disabling conditions.

6. During the rulemaking on the employer reporting requirement at issue, comments were submitted to the Docket by two members of the CSTE Occupational Health Subcommittee

(Letitia Davis, ScD and Kenneth Rosenman, MD). These comments set forth in detail the rationale for employer submission of electronic reports, the use of the publicly disclosed reports by CSTE epidemiologists, and the impact these employer reports have on reducing the large burden of work-related injuries and diseases in the US. These comments are attached to this declaration.

7. OSHA's partial suspension of the electronic submission and public disclosure requirements has caused CSTE members to lose access to an important source of timely, establishment-specific injury and illness information, impairing their ability to use the information to implement public health recommendations and inform regulatory action.

Executed in San Francisco, CA on September 4, 2018.

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct.

*[signature]*

Robert Harrison, MD, MPH



National Headquarters
2872 Woodcock Boulevard | Suite 250
Atlanta, Georgia 30341
770.458.3811 | fax 770.458.8516

www.cste.org

*CSTE is an organization that supports epidemiologists practicing at the state, territorial, tribal, and local levels.*

**Executive Board:**

**President:**
**Tim Jones, MD**
*State Epidemiologist*
Tennessee

**President-Elect:**
**Alfred DeMaria, Jr., MD**
*State Epidemiologist*
Massachusetts

**Vice President:**
**Laurene Mascola, MD, MPH**
*Chief, Acute Communicable Disease Control Program*
Los Angeles County

**Secretary – Treasurer:**
**Marcelle Layton, MD**
*Assistant Commissioner of Bureau of Communicable Disease*
New York City

**Chronic Disease / MCH / Oral Health:**
**Renee Calanan, PhD, MS**
*Chronic Disease Epidemiologist*
Colorado

**Environmental / Occupational / Injury:**
**Sharon Watkins, PhD, MA**
*Senior Environmental Epidemiologist*
Florida

**Infectious Disease:**
**Kristy Bradley, DVM, MPH**
*State Epidemiologist*
Oklahoma

**Members-At-Large:**
**Megan Davies, MD**
*State Epidemiologist*
North Carolina

**Janet Hamilton, MPH**
*Manager, Surveillance & Reporting Section*
Florida

**Joe McLaughlin, MD, MPH**
*State Epidemiologist and Chief*
Alaska

**Executive Director:**
**Jeffrey P. Engel, M.D.**

March 6, 2014

U.S. Department of Labor
Occupational Safety & Health Administration
200 Constitution Avenue
Washington, D.C. 20210

RE: OSHA Proposed Rule: Improve Tracking of Workplace Injuries and Illnesses Comment Period

**Comments in response to OSHA's proposed rule to update and amend Occupational Injury and Illness Recording and Reporting Requirements to "Improve Tracking of Workplace Injuries and Illnesses"**

**Docket Number OSHA-2013-0023**
**Submitted by Letitia Davis, ScD, and Kenneth Rosenman, MD, on behalf of the Occupational Health Subcommittee of the Council of State and Territorial Epidemiologists**

On behalf of the Occupational Health Subcommittee of the Council of State and Territorial Epidemiologists (CSTE), we are writing to express strong support for OSHA's proposal [Docket No.OSHA-2013-0023] to add requirements for electronic submission of information on occupational injuries and illnesses that employers are already required to keep under OSHA's record-keeping rule. We also support OSHA's proposed plans to make select data elements available to the public.

CSTE is an organization of member states and territories representing public health epidemiologists. CSTE works to establish more effective relationships among states and other health agencies. It also provides technical advice and assistance to partner organizations and federal public health agencies. The Occupational Health Subcommittee is comprised largely of health professionals working in state and local health agencies, who use a wide variety of data sources to document work-related injuries, illnesses and hazards and, in turn, promote use of the data to improve worker safety and health.

As public health practitioners, we underscore the critical importance of collection, analysis and dissemination of health data to those who need to know for purposes of prevention [Halperin and Baker, 1992; Lee and Thacker, 2011]. Surveillance is an essential component to any comprehensive approach to prevention work-related injuries and illnesses, whether it is at the federal, state, local or establishment level.  OSHA's proposal to electronically collect and make available the data employers already record on work-related injuries and illnesses would substantially enhance occupational health surveillance capacity in the United States. These establishment specific data would increase OSHA's ability to target is limited enforcement and compliance assistance resources more effectively.  Access to these data would also facilitate public health agency efforts to reduce work-related injuries and illnesses in the states, and significantly increase the potential for more timely identification of emerging hazards.   Additionally, we believe that the electronic collection of these data provides OSHA with a valuable opportunity not only to improve the standardization and quality of the data recorded and reported by employers but also to promote use of data by employers and workers to reduce work-related injuries and illness at the establishment and company-wide levels.

Electronic collection of these existing records is in line with many 21st century advances in health data collection made possible by advances in information technology that involve centralized collection and analysis and dissemination of existing data from multiple entities. These include, for example, collection at the state level of data on all hospitalizations, all emergency room visits, and all ambulance runs, and in over 20 states, data on all public and private insurance claims (excluding workers' compensation claim data). [See http://www.apcdcouncil.org.]

Lessons learned from developing these systems may be informative to OSHA. Making this information available more broadly is also consistent with the growing recognition, predominant in the patient safety field, that transparency – sharing of information, including information about hazards - is a critical aspect of safety culture [Leape et al., 2009].

In the following comments, we discuss some of the ways in which the data OSHA is proposing to collect could enhance our and others' efforts to reduce work-related injuries and illnesses and hazards at the state and community levels. We address several of specific questions raised in the notice of the proposed rule. We also include an example from Massachusetts that demonstrates the feasibility of electronically collecting establishment specific case level data on work-related injuries from establishments.

**Identification of emerging problems:**

Case-based occupational health surveillance activities ongoing in the states involve the collection of information about specific cases of health conditions reportable to public health agencies. Reportable conditions vary from state to state but include, for example, work-related respiratory diseases, chemical poisonings, heavy metal poisonings, traumatic amputations and fatal injuries. These sentinel cases are indications that the prevention system has failed and intervention is warranted. They can also be a first indication of a new or newly recognized hazard that needs to be addressed. The ability to search file level data not only in the establishment where the index case is/was employed but also other establishments in the industry to identify similar cases has the potential to facilitate timely identification of emerging hazards. These include both new and newly recognized hazards. A relatively recent case example is illustrative. In 2010, the Michigan Fatality Assessment and Control Evaluation program identified three deaths associated with bath tub refinishing, raising new concern about hazards of chemical strippers used in this process. Subsequent review of OSHA IMIS data identified 13 deaths associated with bath tub refinishing in a 12 year period. These findings led to the development of educational information about the hazards associated with tub refinishing and approaches to reducing risks that was disseminated nationwide to companies and workers in the industry.

**Targeting establishments for preventive outreach in our communities**

Public health activities in occupational health bring to bear not only epidemiologic expertise but skills in health education and communication. Public health investigations of work-related incidents results not only in prevention recommendations to those involved in the incident, but to case studies which allow us to that take lessons learned and disseminate these lessons broadly to other stakeholders. The availability of information on high risk establishments will allow for more targeted and efficient information dissemination. The ability to identify lower risk establishments may also provide new opportunities to learn from employers who are implementing best practices – and potentially to help identify under reporters.

The availability of establishment specific information also offers a potential opportunity to incorporate occupational health concerns in community health planning, which is increasingly

providing the basis for setting community health and prevention priorities. For example, under the Affordable Care Act, hospitals receiving CMS funding are required to prepare Community Health Needs Assessments to accelerate community health improvement and ultimately reduce healthcare costs. Hospitals are required to identify community health needs and health disparities and develop implementation plans to address these local concerns. [See www.CDC.gov/policy/chna.] Information about health and safety risks in local establishments within communities may encourage increased consideration of working conditions in these efforts to address health disparities and reduce work-related injuries and illnesses and associated health care costs. Epidemiologic methods that take into account establishment size are needed to effectively maximize use of the establishment specific data and should be further explored. CSTE looks forward to working with OSHA in this effort.

**Improvement of data quality and use of the data**

While the limitations of employer reported data on work-related injuries and illness are well recognized [Boden and Ozonoff, 2008; Ruser, 2010], these data remain a valuable source information to guide prevention activities at the federal, state and local level.   Observations from interviews with OSHA record-keepers in Washington State suggest that incomplete OSHA records arise in part from lack of knowledge or confusion on the part of some employers about how to accurately and consistently record OSHA reportable cases as well as poor employer prioritization of this task [Wuellner S, and Bonauto, D, 2013].   We see electronic data collection and the public release of selected datasets as a means to improve data quality, knowledge and compliance with OSHA recordkeeping requirements.   The proposed electronic collection of data, in the longer run, offers the opportunity to provide employers with electronic tools (prompts, definitions, consistency edits, and industry specific drop down lists) that have the potential to improve the quality of the data reported. Standardized feedback to establishments and potential reports of establishment specific data could be programmed that would promote use of the data by employers and workers to set health and safety priorities and monitor progress in reducing workplace risks. Consider, for example, the National Healthcare Safety Network (NHSN) implemented by the CDC and used by more than 12,000 healthcare facilities for the collection of healthcare associated infection (HAI) data.  Thirty states use NHSN as the platform to collect HAI data as part of the state's requirement for public reporting of HAIs.  NHSN allows for tiered access at the facility, corporate or state level, and users can generate standardized reports to analyze their data. [See http://www.cdc.gov/nhsn.]

Public accountability via certification of the data reported by the responsible corporate executive also has the potential to contribute to more complete and accurate data collection. Notably, we recognize that the availability of establishment specific data to regulatory and public health agencies also has the potential to decrease reporting of injuries and illnesses by some employers. Some employers may be hesitant to accurately report all injuries and illnesses for fear of enforcement action, public health investigation, or damage to their reputation if disclosed by the media. Increased vigilance by OSHA to identify this potential problem is therefore necessary as OSHA proceeds with this initiative.
Additionally, we recognize the advisability of limiting case level reporting to the larger establishments in this initial effort at data modernization but urge OSHA to consider extending this requirement to smaller sized establishments that, on average experience higher rates of injury and illness, in the future.

**Improvements in Medical Care**

The proposed changes may also contribute to improvements in medical care. Availability of on line data on work-related injuries and illnesses will allow health care practitioners to assess the occurrence of particular injuries or illnesses at the establishments where their patients work. This information will both assist in the diagnosis and management of health conditions and allow health care practitioners to incorporate information on safe work practices into the general lifestyle education they or their ancillary staff provide. For example, a health care provider evaluating a patient with asthma could look at the on-line record of injuries and illnesses for where their patient works. If there were cases of work-related asthma on the log, this would prompt the health care provider to include questions about work-related asthma triggers in taking the patient's history. This new record keeping rule, by facilitating the diagnosis of work-related conditions, will allow for better diagnosis and management of workplace illnesses by health care providers in the community, thereby contributing to a reduction in morbidity, absenteeism and health care costs.

**Employee privacy**

Personally identifying information should be deleted from the online public access database of establishing specific injury and illness data. For research and public health practice purposes, more complete files should be made available. While initially only a more limited public use file may be available, we suggest that in the longer run, OSHA consider establishing multiple files with different levels of detail for different uses/users. It will be necessary to develop accompany requirements/review processes to determine who may have access to these data. This is common practice with many health data sets, for example, the Behavioral Risk Factor Surveillance System, and state hospital discharge data files.

**Feasibility of collecting data electronically from establishments – a case example from Massachusetts**

In 2000, Massachusetts enacted legislation requiring hospitals licensed by the Massachusetts Department of Public Health (MDPH) to develop sharps injury prevention control programs [MGL Chapter 111 sec 53D]. This law echoed the specific requirements of the OSHA bloodborne pathogen standard [29CFR 1910.1030] and added a requirement that hospitals report select data from the OSHA required log of sharps injuries annually to MDPH. MDPH hospitals and hospital workers collaborated in developing a system for reporting standardized data electronically. Each year since 2001, 100% of the MDPH licensed hospitals (n= 99) have submitted data on sharps injuries annually to the MDPH. In recent years, data from all hospitals, which range in size from less than 150 to over 20,000 employees, have submitted electronically through a secure electronic transmission. Annual hospital specific data and statewide reports prepared by MDPH provide information on patterns of sharps injury and sharps injury rates for use by hospitals and hospital workers as well as MDPH. (Findings indicate sharps injury rates have declined and use of devices without engineered safety features has increased, but that more remains to be done to reduce sharps injuries [Laramie, et al., 2012].) This experience in Massachusetts indicates that electronic reporting of case level occupational injury data to OSHA by employers is feasible and can provide useful information for targeting prevention efforts at multiple levels.

**References:**
Boden LI, Ozonoff A. 2008. Capture-recapture estimates of nonfatal workplace injuries and illnesses. Ann Epidemiol, 18 (6):500-506.

Halperin W, Baker (eds.) <u>Public Health Surveillance</u>, Van Nostrand Reinhold, New York, 1992.

Laramie A. Pun V, Fang S, Kriebel D, Davis L (2011): Sharps injuries among employees of acute care hospitals in Massachusetts, 2002-2007, **Infection** Control and Hospital Epidemiology, Vol. 32. No.6.

Leape L, Berwick D, Clancy C, Conway J, Gluck P, Guest J, Lawrence D, Morath J, O'Leary D, O'Neal P, Pinakiewicz D, Issac T (for the Lucien Leape Institute at the National Patient Safety Foundation. Qual Saf Health Care 2009; 18:424-428.

Lee LM, Thacker SM, The Cornerstone of Public Health Practice, Public Health Surveillance 1961-2011, MMWR  Supplements October 7, 2011/60(04;15-21.

Ruser J. 2010. Allegations of Undercounting in the BLS Survey of Occupational Injuries and Illnesses, In 2010 JSM Proceedings, Statistical Computing Section, Alexandria, VA: American Statistical Association.

Wuellner S. and Bonauto D.  Occupational injury recordkeeping among BLS sampled establishments; Implications for national surveillance. Conference presentation at: 2013 American Public Health Association Annual Meeting, Boston, MA. November 5, 2013.